UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANKIE LEWIS, DUANE MCKISSIC,
GARY SROKA, JAMES SUCHOSKI, and
JOHN SERDA

       Plaintiffs,

v.                                  Case No. 14-13091

CITY OF DETROIT, a municipal corporation,       HON. AVERN COHN

       Defendant.
_____/

**MEMORANDUM AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 12) AND DISMISSING THE CASE**

## <u>TABLE OF CONTENTS</u>

I.   Introduction…………………………………………………………………..   1

II.  Background……………………………………………………………….....   1

    A.  Factual Background…………………………………………………..   1

        1.  New DPD Chief and Restructuring…………………………….....   1

        2.  DPD Before and After Restructuring…………………………….   2

        3.  Selection Process………………………………………………..   3

    B.  Procedural Background………………………………………………   5

III.  Standard of Review……………………………………………………….   5

IV.  Violation of the ADEA……………………………………………….........   6

    A.  Legal Standard: ADEA………………………………………………....   6

    B.  Chief Craig's Authority…………………………………………………..   8

    C.  Discussion………………………………………………………..   9

        1.  Stage One: Four <u>McDonnell</u> Elements……………………………   9

           a.  James Suchoski…………………………………………….   9

           b.  Duane McKissic……………………………………………   10

           c.  John Serda…………………………………………………   11

           d.  Frankie Lewis …………………………………………….   12

           e.  Gary Sroka………………………………………………….   13

        2.  Stage Two: Legitimate, Non-Discriminatory Reasoning for the City's Employment Decisions………………………………………   14

        3.  Stage Three: Pretext………………………………………….   17

    D.  Conclusion………………………………………………………………   19

V.  Violation of the ELCRA…………………………………………….................   20

VI.  Conclusion………………………………………………………………..   21

## I.  INTRODUCTION

This is an age discrimination case under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621, et seq. with  pendant state law claims under Michigan's Elliot Larsen Civil Rights Act (ELCRA), MCL § 37.2101, et seq.  Plaintiffs Frankie Lewis (Lewis), Duane McKissic (McKissic), Gary Sroka (Sroka), James Suchoski (Suchoski), and John Serda (Serda)[1] are suing Defendant City of Detroit (the City) asserting that each personally was subject to age discrimination when he was demoted during a restructuring of the City's Police Department (DPD) by Chief James Craig in 2013 under the authority of Emergency Manager Order No. 11. [2]

Before the Court is the City's motion for summary judgment (Doc. 12). For the reasons that follow, the motion will be granted. As will be explained, the plaintiffs have failed to establish a prima facie case of age discrimination under either the ADEA or the ELCRA.  Also, the City had legitimate, non-discriminatory reasons for the decision as to each plaintiff.

## II.  BACKGROUND

### A.  Factual Background

### 1.  New DPD Chief and Restructuring

In 2013, as a consequence of the City of Detroit's dire financial condition, Governor Rick Snyder appointed Kevyn Orr as the Emergency Manager for the City. As Emergency Manager under state law, Orr effectively exercised plenary executive and legislative power relating to the City's governance.  Orr retained consultant groups to do

---

[1] Collectively "Plaintiffs" where appropriate.
[2] Although Plaintiffs refer to similarly situated persons, there is no pending motion for class certification.

assessments of the City's departments, including the DPD, to improve efficiencies of operations as well as reduce the expenses of services.

In June 2013, James Craig (later to be appointed as Chief Craig) met with Detroit Police Command Officer Association (DPCOA) President Steven Dolunt to discuss the restructuring and possible elimination of positions within the department. Within a month of the meeting, Dolunt alerted the command members of the DPD of the discussions at the meeting. As such, Plaintiffs had notice of the likely restructuring of the DPD.

On July 1, 2013, under Emergency Manager Order No. 11, Chief Craig was appointed as Chief of Police for the City. Chief Craig joined the DPD from the Cincinnati Police Department and had no knowledge of the individuals – notably their ages – who held positions on the executive team in the DPD.  (Pl. Resp. to Def. Motion for Summary Judgment, Doc. 17, Ex. 7, Craig Dep. Tr. at 12). The executive team was comprised of appointed positions including the chief, assistant chief, deputy chief, commanders, and inspector/captain. [3]  Customarily, in the past, a new chief had the authority to appoint and/or revoke the appointment of members on the executive team of the department. (Doc. 17, Ex. 7, Craig Dep. Tr. at 8). Chief Craig announced early on his intention to restructure the DPD to, in his words, maximize efficiency and eliminate redundancy.

## 2.  DPD Before and After Restructuring

Prior to the restructuring, the ranks in the DPD were chief, assistant chief, deputy chief, commander, inspector, lieutenant, sergeant, and police officer. Following

---

[3] On September 11, 2013, a teletype was issued advising that Chief Craig was reclassifying the rank of inspector to the rank of captain (Doc. 12 at 3).

restructuring, the ranks were chief, assistant chief, deputy chief, commander, captain, lieutenant, sergeant, and police officer.

Prior to Chief Craig's arrival, there were 18 commander positions. After restructuring, there were 9 commanders (Def. Motion for Summary Judgment, Doc. 12 at 7). Under the restructuring, the DPD eliminated geographical districts. This eliminated the position of commander over districts (Def. Stmt. of Material Facts, Doc. 13, ¶ 42).

Prior to Chief Craig's arrival, there were 20 inspector positions. After restructuring there were 23 captain positions (Doc. 12 at 7).

### 3.  Selection Process

On July 17, 2013, a teletype was issued for the realignment of command and appointment opportunities for the rank of inspector (Doc. 13, ¶ 13). As stated in the teletype, anyone in the rank of sergeant and above interested in the position was to submit a resume and cover letter (Doc. 13, ¶ 13). As will be described, Chief Craig had the ultimate decision making power for selection of the executive team. The selection process was informal; there was no formal schedule or fixed format of interviews and no formal set of questions or written criteria for the selection process. (Doc. 17, Ex. 7, Craig Dep. Tr. at 8-9; Doc. 13, Ex. 16, Jones Dep. Tr. at 21).

Between July 9, 2013 and September 30, 2013, a review was conducted of applicants. The review included the gathering of resumes as well as background checks (Doc. 13, Ex. 15, White Dep. Tr. at 40-44). No information pertaining to age or birthdate was collected. Following the background checks, some interviews were conducted (Doc. 13, Ex. 16, Jones Dep. Tr. at 21). Chief Craig participated in the interviews for the position of assistant chief (Doc 13, Ex. 18, Craig Dep. Tr. at 20-21). Once two assistant

3

chiefs were selected, the assistant chiefs in turn reviewed the applicants for the deputy chief positions (Doc. 13, Ex. 20, White Dep. Tr. at 34-35). Panels for the interviews varied.[4] Once the deputy chief positions were filled, the selected deputy chiefs attended interviews for the selection of commanders and inspectors.

Aside from the interview process, the DPD retained the Strategic Police Partnership, a sub-consulting group of the Bratton Group (Doc. 17, Ex. 7, Craig Dep. Tr. at 18-19). Robert Wasserman (Wasserman), a consultant with the Bratton Group, was given the responsibility of assessing the structure and efficiencies of the DPD. Part of that role was gathering information pertaining to employees' background and experience. Wasserman provided Chief Craig a master resume of DPD employees which contained names and the number of years on the job. The report did not contain any reference to the age of employees.

As noted above, Chief Craig had the ultimate appointment decision making authority. Chief Craig believed that "every day is an interview" and any interaction could be assessed (Doc. 17, Ex. 7, Craig Dep. Tr. at 23). Accordingly, Chief Craig based his decisions on his personal observations, interactions, assessments from work environment, meetings, etc.; discussions with rank and file; recommendations from the assistant chiefs and deputy chiefs; recommendations based on the informal interviews; and recommendations from Wasserman (Doc. 17, Ex. 7, Craig Dep. Tr. at 8-9, 12, 19).

On or around October 2, 2013, individualized letters were distributed to DPD members which provided notification of either his/her appointment to the executive team

---

[4] For example, for the position of deputy chief, one panel was comprised of Chief Craig, assistant chief James White, assistant chief Eric Jones, and consultant Chris Gannon while another panel for the same position was comprised of assistant chief James White, assistant chief Eric Jones, and Chris Gannon (Doc. 13, ¶ 21).

or revocation of appointment, effective October 7, 2013. The revocation of an appointment required a member to revert back to the previous non-appointed position held prior to his or her appointment. On October 8, 2013, a general teletype to the DPD was issued advising of Chief Craig's selections for the executive team as a whole.

Each plaintiff's interview process will be discussed infra.

## B. Procedural Background

The amended complaint (Doc. 5) claims age discrimination for these five individual plaintiffs in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621, et seq. and Michigan's Elliot Larsen Civil Rights Act (ELCRA), MCL § 37.2101, et seq. After a period of discovery, the City filed a motion for summary judgment (Doc. 12). Following a hearing on the motion, both parties filed supplemental briefs (Docs. 27, 28, 29). For the reasons that follow, the motion is GRANTED.

## III. STANDARD OF REVIEW

The standard for summary judgment is well known and is not repeated in detail. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact drawing "all justifiable inferences in the light most favorable to the non-moving party." Hager v. Pike Cnty. Bd. of Ed., 286 F.3d 366, 370 (6th Cir. 2002).

5

## IV. VIOLATION OF THE ADEA

### A.  Legal Standard: ADEA

The ADEA prohibits an employer from discharging an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may proceed on a claim of age discrimination on the basis of direct or circumstantial evidence. Dekarske v. Federal Express Corp., 294 F.R.D. 68, 79 (E.D. Mich. 2013)(citing Lefevers v. GAF Fiberglass Corp., 667 F.3d 721, 723 (6th Cir. 2012). The burden of persuasion is on a plaintiff to demonstrate that "age was the 'but-for' cause of the employer's adverse action." Id. (internal citations omitted).

Here, Plaintiffs base their discrimination claims on circumstantial evidence under the McDonnell Douglas Corp. v. Green, 411 U.S. 793 (1973), burden shifting standard. Under the McDonnell Douglas standard, proof proceeds in three stages.

First, a plaintiff must establish that (1) he/she was at least 40 years old at the time of the alleged discrimination; (2) he/she suffered an adverse employment action; (3) he/she was otherwise qualified for the position; and (4) he/she was replaced by someone outside the protected class. Geiger v. Tower Automotive, 579 F.3d 614, 622 (6th Cir. 2009). In age discrimination cases, the replacement need not be outside the protected age group so long as the individual is a "significantly younger person." Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003). The court in Grosjean established a bright line rule to determine what constitutes "significantly younger" for an age discrimination case: "[I]n the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." Id. at 340.

6

If the termination arises as part of a work force reduction, the Sixth Circuit has modified the fourth element to require a plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" Geiger, 579 F.3d at 623 (internal citation omitted). The Court in Gordon v. Saginaw Pub. Schs., 2011 WL 595567 (E.D. Mich. 2011) explained the standard for workforce reduction situations:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. …**In a reduction in force case, the plaintiff does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.** The evidence must be sufficiently probative to allow a factfinder to believe that the employer **intentionally discriminated** against the plaintiff because of age.

Gordon, 2011 WL 595567 at *11-12 (internal citations omitted).

If a plaintiff establishes the four elements under the Sixth Circuit's standards, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment decision. In explaining this reason, the employer need not persuade the court that it did not discriminate against the applicant. Instead the employer must point to admissible evidence to raise a genuine issue of fact as to whether the employer rejected the applicant based on a discriminatory motive. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).

Finally, once the employer proffers non-discriminatory reasoning for its decision, "the presumption of discrimination no longer exists and [a plaintiff] must prove that the reasons offered by the [employer] were in fact pretextual in order to prevail." Dekarske, 294 F.R.D. at 84 (internal citations omitted). In order to demonstrate pretext at the summary judgment stage, a plaintiff "must produce sufficient evidence from which a jury

7

could reasonably reject the employer's explanation for the adverse employment action."
Id. The employer is entitled to summary judgment if a plaintiff "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." Id. (internal citations omitted).

### B.  Chief Craig's Authority

Chief Craig, as the Chief of police, had the power and authority to appoint/revoke the appointment of members on the executive team of the DPD for the efficient operations of the department (Def. Corrected Stmt. of Material Facts, Doc. 14, ¶¶ 5-6; Doc. 17, Ex. 10, White Dep. Tr. at 21-22). The appointed DPD command positions were initially at-will positions; however, during contract negotiations in 2010, they became "just-cause" positions. Once the contract expired on July 18, 2012, the City imposed City Employment Terms (CET) wherein the positions of inspector and commander were again considered "at-will." Thus, the Chief had authority under the CET to appoint a member or revoke an appointment, without cause (Doc. 13, Ex. 5 at 2, ¶2).

Additionally, under the Emergency Manager Order No. 11, Chief Craig had the authority to decide who would be placed in the appointed positions (Doc. 13, Ex. 6).[5]

In sum, Chief Craig had the power and authority to appoint/revoke the appointment of DPD executive command staff at his will.

---

[5] When appointing Chief Craig, Orr said: "PA 436 authorizes the EM, notwithstanding any charter provision to the contrary to remove, replace, appoint, or confirm the appointments to any office, board, commission, authority, or other entity which is within or is a component unit of the local government… [T]he appointment of a new Chief of Police will enhance the City's capacity to provide necessary governmental services essential to public health, safety, and welfare." Emergency Manager Order No. 11, PA 436 (2012).

## C. Discussion

### 1. Stage One: Four <u>McDonnell</u> Elements

Neither side contests whether the first three elements of the <u>McDonnell</u> standard were established; therefore, there are no genuine issues of material fact regarding the first three elements. The parties concentrate on the fourth <u>McDonnell</u> element, so the Court will focus on the fourth element, as well. This element requires the review of whether the City has established there is no genuine issue of material fact as to whether a plaintiff was replaced by someone significantly younger and, because this is a workforce reduction scenario, whether any plaintiff has provided additional direct, circumstantial, or statistical evidence tending to indicate that the City singled out the plaintiff for discharge for impermissible reasons.

#### a. James Suchoski

Suchoski (49) was hired by the City as a police officer on May 16, 1988. His position prior to the restructuring was commander of the western district. Suchoski applied for a deputy chief position under the restructuring. There is no evidence on the record that Chief Craig knew Suchoski's age at any point prior during the restructuring. On or around October 3, 2013, Suchoski was given notice that his appointment was revoked and that he reverted back to lieutenant, his last non-appointed position prior to commander, effective October 7, 2013. Suchoski retired on October 6, 2013. Subsequent to his last day of work, Suchoski began receiving a pension of $5,324.97/month.

Under the restructuring, the district structure was eliminated. This resulted in positions, such as Suchoski's commander of the western district position, being

9

consolidated and eliminated. The new position created in place of the commander of the western district was commander of patrol west, which was filled by Charles Fitzgerald (44). The age difference between Suchoski and Fitzgerald is only five years; therefore, Suchoski was not replaced by someone "significantly younger." Grosjean, 349 F.3d at 340.

Further, Fitzgerald did not directly replace Suchoski, because Suchoski's position was eliminated. Because this was a workforce reduction and not direct replacement, the fact that Suchoski was replaced by a younger individual does not, on its own, create an inference of age discrimination. Gordon, 2011 U.S. Dist. LEXIS 13463, *11 (E.D. Mich. 2011).

Thus, the City has established that there is no genuine issue of material fact as to whether Suchoski met the fourth element under McDonnell. The City is entitled to summary judgment as a matter of law against Suchoski.

### b.  Duane McKissic

McKissic (51) was hired by the City as a police officer on October 20, 1986. His position prior to the restructuring was commander of the northeastern district. McKissic applied for a deputy chief position under the restructuring. There is no evidence on the record that Chief Craig knew McKissic's age at any point prior during the restructuring. On or around October 3, 2013, McKissic was given notice that his appointment was revoked and that he reverted back to lieutenant, his last non-appointed position prior to commander, effective October 7, 2013. McKissic resigned on October 7, 2013. Subsequent to his last day of work, McKissic began receiving a pension of $5,826.38/month.

Similarly to Suchoski, the restructuring eliminated McKissic's position as commander of the northeastern district. The new position created to replace commander of the northeastern district was commander of patrol east, which was filled by Darryl Brown (52). Brown is one year older than Suchoski. Therefore, Suchoski was not replaced by someone "significantly younger" and the fourth element of the McDonnell standard is not satisfied.

Further, Brown did not directly replace McKissic, because McKissic's position was completely eliminated. Because this was a workforce reduction and not direct replacement, the fact that Brown was replaced by a younger individual does not, on its own, create an inference of age discrimination. Gordon, 2011 U.S. Dist. LEXIS 13463, *11 (E.D. Mich. 2011).

Thus, the City has established that there is no genuine issue of material fact as to whether McKissic met the fourth element under McDonnell. The City is entitled to summary judgment as a matter of law against McKissic.

### c.  John Serda

Serda (59) was hired by the City of Detroit as a police officer on September 20, 1993. His position prior to the restructuring was commander of the southwestern district. Serda applied for a deputy chief position under the restructuring. There is no evidence on the record that Chief Craig knew Serda's age at any point prior during the restructuring. On or around October 4, 2013, Serda was given notice that his appointment was revoked and that he reverted back to lieutenant, his last non-appointed position prior to commander, effective October 7, 2013.  However, that same

day, Serda was notified that he would be appointed as captain, effective October 7, 2013. At that time, his salary was raised from $89,820.00 to $90,000.00.

Similarly to Suchoski and McKissic, Serda's position of commander over a district was eliminated under the restructuring. The new position created in place of the commander of the southwestern district was commander of patrol west, which was filled by Charles Fitzgerald (44). Because this is an example of workforce reduction, the fact that Serda was replaced by a younger individual does not, on its own, create an inference of age discrimination. Gordon, 2011 U.S. Dist. LEXIS 13463, *11 (E.D. Mich. 2011). Therefore, while Serda may argue that he was replaced by Fitzgerald (44), a "significantly younger" replacement, Fitzgerald's position was a newly created position under Chief Craig's authority.

Thus, the City established that there is no genuine issue of material fact as to whether Serda met the fourth element under McDonnell and the City is entitled to summary judgment as a matter of law against Serda.

### d. Frankie Lewis

Lewis (50) was hired by the City as a police officer on April 10, 1989. His position prior to the restructuring was commander of major crimes. Lewis applied for a deputy chief position under the restructuring. There is no evidence on the record that Chief Craig knew Lewis' age at any point prior during the restructuring. On or around October 3, 2013, Lewis was given notice that his appointment was revoked and that he reverted back to lieutenant, his last non-appointed position prior to commander, effective October 7, 2013. Lewis retired on April 10, 2014 and received an estimated pension check of

$5,579.11/month. On February 25, 2015, Lewis returned to work for the DPD as a part-time police assistant with compensation of $21.00/hour with no other fringe benefits.

Following the restructuring, Lewis was replaced by Nicholas Giaquinto (45). The age difference between Lewis and Giaquinto is five years. Therefore, Lewis was not replaced by someone "significantly younger" and the fourth element of the McDonnell standard is not satisfied.

Thus, the City established that there is no genuine issue of material fact as to whether Lewis met the fourth element under McDonnell and the City is entitled to summary judgment as a matter of law against Lewis.

### e. Gary Sroka

Sroka (60) was hired by the City of Detroit as a police officer on May 19, 1977. His last position with the DPD was as an inspector.  Sroka applied to continue in his rank as captain under the restructuring. There is no evidence on the record that Chief Craig knew Sroka's age at any point prior during the restructuring. On or around October 3, 2013 Sroka was given notice that his appointment was revoked and that he reverted back to lieutenant, his last non-appointed position prior to inspector, effective October 7, 2013. Sroka held the position of inspector until October 7, 2013, when he was effectively reverted to lieutenant. At that time, his salary was reduced from $90,300.00 to $68,598.00.

Following the restructuring, Sroka was replaced by Donna Jarvis (52). While there is an eight year age difference between Sroka and Jarvis, Sroka failed to establish that age discrimination was the "but-for" cause of the City's adverse action. Chief Craig's decision regarding the revocation of Sroka's appointed title was based on

13

recommendations and discussions with Sroka's co-workers during which it was reported that Sroka did not interact well with others. This was problematic to Chief Craig (Doc. 17, Ex. 7, Craig Dep. Tr. at 50-51). Consultant Wasserman noted that Sroka was an "older cantankerous guy/loafed in room." (Doc. 17, Ex. 15, Wasserman Notes at 15). Chief Craig has the impression that Sroka struggled with interaction with people. (Doc. 17, Ex. 7, Craig Dep. Tr. at 50). Assistant Chief White gave input that Sroka was viewed by subordinates as "brash" and "at points inappropriate." (Doc. 17, Ex. 10, White Dep. Tr. at 53).

Thus, the City established that there is no genuine issue of material fact as to whether Sroka met the fourth element under McDonnell and the City is entitled to summary judgment as a matter of law against Sroka.

### 2. Stage Two: Legitimate, Non-Discriminatory Reasoning for the City's Employment Decisions

Assuming Plaintiffs have established a prima facie case of discrimination under McDonnell, the burden of production shifts to the City to "rebut the presumption of discrimination by producing evidence that [each plaintiff] was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. As noted above, Plaintiffs failed to establish a prima facie case for McKissic (replaced by Brown who is one year older than McKissic), Lewis (replaced by Giaquinto who is five years younger in age), and Suchoski (replaced by Fitzgerald who is five years younger in age). However, the parties contest whether Plaintiffs established a prima facie case of discrimination for Sroka and Serda.

Plaintiffs' argument that the City has failed to provide legitimate, non-discriminatory reasoning for its employment decisions because it did not clearly set forth

14

the reasons for each plaintiff's demotion is without merit. <u>Burdine</u>, 450 U.S. at 255. The City offered specific reasons for its employment decisions regarding each Plaintiff.

First, as noted above, Chief Craig had authority under the CET. The executive team held at-will positions, meaning they could be removed from the position at any point, without cause.

Second, as noted above, Chief Crag had authority under the Emergency Manager Order No. 11 to restructure the department, which included various personnel changes. Accordingly, under the Emergency Manager Order No. 11, Chief Craig had the discretion to select his executives.

Third, and most importantly, Chief Craig based his employment decisions on particularized and admissible evidence.  For example, Chief Craig was informed that Major Crimes had an absence of leadership and management; therefore, the revocation of Lewis' appointed position, Commander of Major Crimes, was appropriate (Doc. 17, Ex. 7, Craig Dep. Tr. at 36). Craig noted that in his conversations with McKissic, he gained the impression that McKissic was suggesting that others within the DPD were more talented and deserving of command positions rather than himself (Doc. 17, Ex. 7, Craig Dep. Tr. at 47). Further, as noted above, Chief Craig's decision regarding the revocation of Sroka's appointment was based on recommendations and discussions with Sroka's co-workers who reported that Sroka did not interact well with others. (Doc. 17, Ex. 7, Craig Dep. Tr. at 50-51).  On a similar note, Wasserman noted that Sroka was an "older cantankerous guy/loafed in room." Chief Craig had the impression that Sroka struggled with interaction with people. Assistant Chief White gave input that Sroka was viewed by subordinates as "brash" and "at points inappropriate." (Doc. 17,

Ex. 10, White Dep. Tr. at 53). In regards to Serda, consultant reports stated that Serda's section was in "total disarray" and that community stakeholders did not have confidence in him (Doc. 17, Ex. 7, Craig Dep. Tr. at 53-54). Assistant Chief White's deposition also noted that he and Assistant Chief Eric Jones doubted Serda's effectiveness as a leader and that he and Jones discussed Serda's lack of leadership skills in the context of deciding whether to recommend Serda for promotion. (Doc. 17, Ex. 10, White Dep. Tr. at 57).

Separately, Plaintiffs say that the City provided no evidence as to why Plaintiffs were denied interviews, and the City, therefore, did not provide sufficient reasoning to meet the Burdine standard. This argument is without merit. Denial of a formal interview does not automatically translate to meaning that Plaintiffs were entirely disregarded for command positions. As noted above, the interview process was informal and Chief Craig made his decisions based on various elements including day-to-day conversations with employees and recommendations from consultants and other command personnel.

Finally, the non-discriminatory nature of the City's decisions was bolstered in the deposition of Chief Craig during which he stated that he was not aware of any of the candidates' ages until the filing of this lawsuit (Doc. 13, Ex. 30, Craig Dep. Tr. at 70). While Chief Craig was the sole decision maker, he did not act arbitrarily. He made his decisions following discussions with consultants on how the department should operate[6]; recommendations of assistant and deputy chiefs; conversations with rank and

_____

[6] While Plaintiffs say that the employment decisions should be ruled as discriminatory because Chief Craig did not personally interview the Plaintiffs for their desired positions, the record shows that Wasserman made notations about each Plaintiff and conveyed his recommendations to Chief Craig. (Doc. 17, Ex. 15, Wasserman Notes).

16

file; and observations in the workplace. Craig was satisfied that there was a consensus that the DPD was top heavy, in need of restructuring, and comprised of a stagnant command staff who were resistant to change. In the final analysis, Chief Craig made his decisions based on what in his opinion was the best fit for the department.

Accordingly, the City provided legitimate, non-discriminatory reasoning for its employment decisions and established that age was not the but-for reason for the structural changes.

### 3.  Stage Three: Pretext

Assuming the City has articulated legitimate, non-discriminatory reasons for its employment decisions, to survive summary judgment, Plaintiffs had to establish that the proffered reasons were pretextual. A plaintiff can refute the legitimate, nondiscriminatory reasons that an employer offers to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 815 (6th Cir. 2011). Plaintiffs have failed to meet this burden.

The City had a legitimate non-discriminatory reason for its actions – that being the department was restructured to redeploy its authority citywide.  Plaintiffs rest solely on the fact that they were replaced by younger individuals and speculation that age was the reason for their replacement. "In attacking an employer's explanation for the discharge, [Plaintiffs] may not rely upon 'mere personal beliefs, conjecture and speculation.'" Chappell v. GTE Products Corp., 803 F.2d 261, 268 (6th Cir. 1986). "Courts have repeatedly held that the plaintiff's denial of the defendant's articulated

17

legitimate reason without producing substantiation for the denial is insufficient for a [ ] discrimination claim to withstand a motion for summary judgment." Mitchell v. Toledo Hosp., 964 F.2d 577, 585 (6th Cir. 1992).

The record establishes that age was not a consideration. In fact, Chief Craig promoted and retained several DPD employees over the age of 40, including James White (45) in the assistant chief position; Brian Stair (46) in the commander position; and Daniel Allen (50), Conway Petty (55), and Russell Solano (57) in the inspector/captain position. Further, while Plaintiffs chose to file an age discrimination suit, six other individuals who either retired prior to de-appointment or accepted their lower ranking positions on the executive team chose not to file a complaint against the City.[7] The fact that the five plaintiffs here are the only former City employees to claim age discrimination speaks for itself.

Plaintiffs point to Chief Craig's reference as some being retired in place to establish that age was a consideration and the fact that he asked McKissic if he "picked up his package" (ie: retirement package) and frowned after learning that he had not. This argument lacks merit. In the DPD, "retired in place" jargon is understood to mean complacent, non-effective, and not doing one's work (Doc. 17, Ex. 9 at 64-65).

Plaintiffs point to statistical data showing that the average age of the executive team was significantly reduced to prove that age was a factor in the decision making process. However, the statistics Plaintiffs have provided do not take into account

---

[7] Robert Ennis (62) retired prior to de-appointment; Steven Dolunt (57) was de-appointed from commander to captain; Eric Ewing (50) was de-appointed from deputy chief to captain; Dwane Blackmon (54) retired prior to de-appointment; Nick Kyriacou (52) was de-appointed from inspector to lieutenant; and Leslie Montgomery (53) was de-appointed from inspector to lieutenant.

individuals retiring prior to the selection process[8] and are taken from too small a sample.[9] A sample size that is too small can undercut the probative value of the statistics. Simpson v. Midland-Ross Corp., 823 F.2d 937, 943 (6th Cir. 1987).[10] As noted in International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977), "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." Id. at 340.

Accordingly, Plaintiffs' conclusory allegations of discrimination are, without more, insufficient to withstand a motion for summary judgment.

### D.  Conclusion

Plaintiffs failed to establish the fourth McDonnell element for Plaintiffs Lewis, Suchoski and McKissic. In regards to Serda and Sroka, Plaintiffs have not produced sufficient evidence on which a reasonable jury could reject the City's explanation for the adverse employment action. The record conclusively revealed a non-discriminatory reason for the City's restructuring decisions and Plaintiffs created at best only a weak issue of fact as to whether the employer's reason was untrue. Chen v. Dow Chemical

---

[8] For example: assistant chief Paul Wells (54); deputy chief Morris Wells (61); deputy chief James Tolbert (53); commander Robert Ennis (62).

[9] See Kirkpatrick v. General Elec., 963 F.Supp. 628 (1997) aff'd by 172 F.3d 873 (6th Cir. 1999). In Kirkpatrick, the plaintiff's statistical evidence consisting of the fact that 6 of 13 employees holding a particular position were terminated over a three-year period and 5 of those 6 were replaced with younger employees was found insufficient to prove discrimination.

[10] In Simpson, the plaintiff relied on the departure of 17 individuals as a basis for a statistical argument. The court found the small sample size suspect. Moreover, the statistical evidence failed because it did not account for individuals who might have retired early or voluntarily. Thus, the data was rejected because the "methodology and the explanatory power of the statistical analysis" was not sufficient to permit an inference of discrimination." Id. at 944. Like in Simpson, the sample size Plaintiffs used was too small and is an insufficient basis for an inference of discrimination.

19

Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009). The burden of persuasion remained on Plaintiffs to demonstrate that age was the but-for cause of their employer's adverse action. Geiger, 579 F.3d at 620. Plaintiffs failed to do so. There was no systematic removal of older employees and age was not a factor in the equation.

## V.  VIOLATION OF THE ELCRA

Age discrimination claims under the ELCRA are assessed using the same analytical framework as those made under the ADEA. Unlike the ADEA with an established age limit of over 40 years of age, the ELCRA does not have such a limit. Under the ELCRA, a prima facie case can be made by proving intentional discrimination and/or disparate treatment. Meagher v. Wayne State University, 222 Mich. App. 700 (1997). If there is no direct evidence of discrimination, Plaintiffs must rely McDonnell principles to establish their prima facie case of discrimination. Hazle v. Ford Motor Co., 464 Mich. 456, 462-63 (2001).

Plaintiffs say that the City was predisposed to discriminate based on age and acted in accordance with that predisposition (Amended Compl.,Doc. 5, ¶ 45). To prove intentional discrimination, Plaintiffs must show that (1) they were members of a protected class; (2) they suffered an adverse employment action; (3) they were qualified for the position; and (4) they were replaced by a younger person. Matras v. Amoco Oil Co., 424 Mich. 675 (1986). Plaintiffs must also show that age was a determining factor in the employment decision. Lytle v. Malady (on Rehearing), 458 Mich. 153, 178 (1998).

Plaintiffs cannot show intentional discrimination when the record is absent of evidence to show animosity toward any specific age group. As noted above, the age range of persons receiving new appointment ranged from 37 years old to 59 years old

and the range of personnel whose appointment was revoked ranged from 41 years old to 60 years old. There is no indication that age was a determining factor in any of the employment decisions described above.

Plaintiffs each further argue that the City illegally discriminated against them by treating them in a disparate manner from younger colleagues with respect to the terms and conditions of employment, promotional opportunities, and compensation (Doc. 5, ¶ 47).  To prove disparate treatment under the ELCRA, a plaintiff must establish that he was a member of a protected class and he was treated differently than persons of a different class for the same or similar conduct. Barnell v. Taubman Co., 203 Mich. App. 110, 120-21 (1993). Each plaintiff's basis for this argument is a replacement by a younger individual. "[Plaintiffs'] replacement by [] younger employee[s], without more, is insufficient to support a claim of age discrimination." Id. Plaintiffs' speculations as to Chief Craig's motivations and intentions are insufficient to avoid summary judgment. Ashcroft v. Iqbal, 556 U.S. 662 (2009).

## VI.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.

s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: January 6, 2016
Detroit, Michigan